DURANT, AND FRIENDS. Good morning, Your Honors. May it please the Court, Philip Trevino for the Defendant Appellant Anthony Durant. And as the Defendant's position was fully set forth in the brief, unless the Court has questions, I'm prepared to submit the matter at this point. Judge Friedman, Judge Raulston, do you have any questions? Thank you, Your Honors. It is well briefed. There's no doubt about that. Thank you, Your Honor. Good morning, Your Honors. Karen Bucher for Charmaine Walker, the Appellant. And I, with Mr. Trevino, have nothing to add to my brief. I didn't even file a reply brief. I thought it answered all the questions. And I'm here for questioning by the Court. Well, I'd like to ask you a question. I take it the basic issue in this case on the merits is whether the people who were selling this stock were aware of what was going on. Is that right? That's correct, Your Honor. That's where this whole case turns on. And, you know, there was evidence both ways, and the jury resolved it against you. As far as my client is concerned, Ms. Walker, I don't believe that the record doesn't show that she knew what was going on. She was hired into a fancy office. There was beautiful furniture. She had an office. There were lawyers. There were – she talked to the lawyers. There were the gloves on the premises. In the excerpts of the record, I have pictures of the warehouse that says assured and the gloves. There's so many things in there that make her believe that the company was legitimate. Counsel, that might be true up until the point that the enterprise was moved into her apartment. How do you explain that? Yes. Well, let me tell you, Your Honor, what happened was she was told by Sam Harris and the attorneys that the SEC investigation was taken care of, and it was a matter of just signing documents, that it was not legal to make the phone calls off the premises. It was just illegal to make the phone calls on the premises. And that's what she believed, and that's what she was told. And if you look at the testimony from the government's witnesses, Max Becker and Charles Peterson, they said the same thing. They said that they both were led to believe that the problems with the SEC were minor, that they were working out the details with courts, and the attorneys told them this, and she felt at peace with that. And so she said, okay. Counsel, wasn't there also testimony that your client and another of the workers there were laughing about the statements that they made to their mark? Charles Peterson. There was one instance in there that I recall that he testified with one comment that she had made, and I don't remember the comment off the top of my head, but I do remember that. But isn't that enough to defeat your sufficiency of the evidence argument? No, I don't think so. If the jury believed that testimony, then doesn't that constitute sufficient evidence to convict her? It depends at that point, and I can't remember right now whether that was a material point, whether they were telling the investigators. Well, if Peterson testified that he and Walker were joking together about how they lied to investors, I mean, wouldn't that be enough to justify a jury in believing that she wasn't duped? I mean, she also said she was relying on the brochures, yet she knew that Harris and not Becker, as stated in the brochures, was in charge. She knew that she had not invested. She was telling people she had. I mean, isn't that enough for a jury to conclude that her claim that she was just waiting for a bus wasn't valid? I don't think the record shows in her mind that she really knew that she was depraved. But a jury heard all of this and said, yeah, we think that she's lying to us about not knowing what was going on. And there's a lot of support for that. You know, one of the things that the government relies on to support the conviction is the testimony of Camille Hammonds, which at first I thought was damaging. And I looked at it, and Camille Hammonds was the agent, was the case agent. And she was the one that interviewed Ms. Walker at her apartment after it was raided. And Ms. Hammonds testified that Ms. Walker said that she knew about the SEC investigation and that she knew that they weren't supposed to be selling stock. But really what she was saying is that she knew about that, but she was told by the owners and by the lawyers that it was still okay, even though they were shut down at the premises that assured the premises, but they still could make telephone calls elsewhere. Had she made any investments in this operation? No. She didn't. Then how does she get away telling people on the phone that she had? That's puffing. A lot of people say things like that. That's what? It's what salespeople do a lot of times. And I didn't think it wasn't a material point. That it's puffing? That's what's. It's a flat-out lie? A lot of salespeople do. But the question is, was that the material point that the people made their investment decisions on? It's an old selling point, you know, that the stock salesman says, this is such a good company, I put my own money into it. And that's an effect which you do with selling people. And that was false. It would make you feel more confident, wouldn't it, if you were approached on the telephone to buy some stock and the salesman said, I'll put some of my own money into this company? I might consider that, but that wouldn't be my point. The investor said it was material in their decisions as to whether to invest. The people who were defrauded by these lies that you say are no big deal. Well, I think most of them said they were actually persuaded by the brochure, the PPM. Which was full of lies, and she knew that. I don't think she knew that. The record shows that she did not know that. What she was informing the investors was information that she received from the meetings, information she was fed to by Sam Harris and the others. You know, when you come to us and say that facts that convinced a jury to convict aren't sufficient, you've got an awfully high hurdle to clear. The last thing I just wanted to point out about Camille Hammonds, she testified that Ms. Walker knew about the... Contempt order? What? Who's Hammonds? Is that the Postal Inspection Service? The Postal Inspector that was the case agent that sat through the trial, and she testified because she interviewed Ms. Walker at her apartment. And she said something pretty striking. She said that Ms. Walker said it was her idea to establish the Renaissance Company and open a bank account. And if you read the government's brief on page 11, it says, On May 19, 1999, defendant acting at Harris's direction filed articles of incorporation for Renaissance Group and opened a bank account. So even the government didn't even believe that. I just didn't. And... Well, did Walker tell the Postal and Service Investigator she was aware of this order, by the way? Yes, she did. The TRO? She knew that it existed, but she only knew – she didn't know its terms. She only knew what the attorneys told her. She spoke to two attorneys that represented Assured, and she also spoke with the owner, and she believed them. Was she – nobody – she never was told by any attorney, was she, that despite the order it was okay for her to continue selling because she wasn't named in the order? No, I don't think that was the issue. She never saw the order, so she only was told what to do by the attorneys and by the... How do we know she never saw the order? The record doesn't – well, the record doesn't say that she's seen it. And I – there's no evidence that she did. They found a newspaper article describing it in the asset freeze in her apartment. Is it a fair inference? There was an article, and there was something else that was found. It was a Post-it note that she wrote the name of the – or someone did. I think it was her that wrote the name of the case, and the case number. Apparently, an investor of hers from Northern California told her about, you know, there's something going on. So she took some notes with the intent to talk to Sam Harris. What's going on here? What is going on? And she was constantly told, everything's going to be taken care of. It's just a matter of signing documents. And the government witnesses all say the same thing. That's why I don't believe that she knew that she was in violation of court order. She hadn't seen it, and she only knew what the attorneys and what Sam Harris told her, and she followed that. Okay. Thank you, counsel. Good morning. I'm Jerry Watley, and I represent Henry Perrin. I'm also of the view that the case has been adequately briefed on the issues that I discussed, and I'm prepared to submit subjects of any questions that the Court may have. Do you have anything to say about the two-level enhancement for vulnerable victims? I didn't raise that issue. Okay. You didn't raise that. All right. That's why I asked. Okay. Thanks. I came here for a big war. May it please the Court, Judge Pukes, Assistant United States Attorney for the Government. Your Honors, I'll address the Defendant Walker's arguments concerning her convictions. Your Honors, the fundamental issue at trial was whether or not the salespeople, including Defendant Walker, acted with the requisite intent to defraud or whether they had been duped. And the government introduced overwhelming evidence that Defendant Walker, as well as the other defendants, had, in fact, acted with the intent to defraud. And we know Defendant Walker acted with the intent to defraud for several reasons. First, she made a number of different misrepresentations. There were misrepresentations contained in the brochures and pitches that she used. She went above and beyond simply relying on the brochure and pitches, however, and added misrepresentations on her own when she was talking with prospective investors. In addition to the misrepresentations, there are significant omissions that Defendant Walker made. All of the investors who testified about discussing a potential investment with Defendant Walker invested after the TRO had been issued, after the plumerian junction had been issued. The other side said this is just industry standard puffing. And, Your Honor, there was one case cited to support that point. It was the In Re Cypress Semiconductor case. And in that case, the court had held that vague and indefinite predictions on the part of a company could not serve as the base of a misrepresentation in a civil securities matter. Here we have quite a different situation. Here we have specific misrepresentations about what investors could expect in the way of return. And multiple investors who bought stock based on Defendant Walker's representations all explained how it was that they were told that they could expect very attractive returns over a specific period of time. And they all lied. Weren't they also told that very soon the company would go public? They were told that the company would go public. And I think that it's telling that not only did Charles Peterson testify that he knew that the company was not going to go public. Not only was there no evidence of a potential initial public offering, but Defendant Walker, in an interview with Camille Hammond, said that she never told any investors that the company was about to go public. The implication or inference that the jury could draw from that is that she knew that the company wasn't going to be going public, so why would she make that misrepresentation? Exactly what did Peterson say about joking about lying? Yes, Your Honor. That exchange between Defendant Peterson and Defendant Walker took place after they had moved the assured operation into Defendant Walker's apartment. Defendant Walker and Peterson were joking, I believe, about a misrepresentation concerning the number of salespeople that they were telling prospective investors were out working selling product on behalf of assured. Selling gloves. Selling the latex gloves. In fact, there was no one out selling the latex gloves at that point. They were telling investors there were as many as 40 salespeople. The investors found that important material. They testified as much. And Defendant Walker and Peterson were joking about that. Now, as our record to rule is, we view the evidence most favorable to the prosecution after a jury conviction verdict, don't we? That's correct. It is a daunting standard for the defendants to overcome. And here, a rational trier of fact could and did find the defendants guilty of the male wire securities fraud counts and the conspiracy count. If you'd like, I can turn to the evidence that supports the contempt conviction. Or if you have no further questions, I can submit on the briefs, both with regard to the convictions and the sentencing arguments. Although I expended a lot of energy bringing all these materials out here. Well, we have prepared extensive analyses of the case. So unless you have nothing else, you have no questions. I guess that's it. Thank you. Anybody have any response? All right. The case stands submitted. Thank you all very much. We'll get you a decision as soon as we can. And Mr. Curnow, whose timing is always impeccable, has has arrived. So we will call the final case on the calendar, which is United States versus Raul Torres Garcia. Excuse me. Would you like me to move it out of the way altogether? Yeah. Yeah. Yeah. Oh, yeah. Move it. Oh, sure. Thank you. Absolutely. Yes. Thank you. Thank you. Thank you.
judges: Friedman, Trott, Rawlinson